# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CIBC BANK USA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2024-0978-LWW |
| | ) | |
| RYAN BARKER, JIM SHEWARD, | ) | |
| JIM STENGEL, SCOTT MILLER, | ) | |
| JIM MCTAGGART, JEFFREY | ) | |
| PEACOCK, JUSTIN REGER, and | ) | |
| PEAKEQUITY PARTNERS I, L.P., | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| BERA BRAND MANAGEMENT, | ) | |
| INC. | ) | |
| Nominal Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: February 26, 2026
Date Decided: May 29, 2026

Bruce E. Jameson, Samuel L. Closic, & Caitlin E. Whetham, PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; Douglas R. Gooding, Bryana T. McGillycuddy, John B. Lucy Jr., & Derek Farquhar, CHOATE, HALL & STEWART LLP, Boston, Massachusetts; *Counsel for Plaintiff CIBC Bank USA*

Travis J. Ferguson, Sarah E. Delia, & Faith C. Johnson, MCCARTER & ENGLISH, LLP, Wilmington, Delaware; *Counsel for Defendants Ryan Barker, Jim Stengel,*

*Scott Miller, Jim McTaggart, Jeffrey Peacock, and Nominal Defendant BERA Brand Management, Inc.*

John M. O'Toole, Rudolf Koch, & Susan Hannigan Cohen, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; *Counsel for Defendants Jim Sheward, Justin Reger, and PeakEquity Partners I, L.P.*

**WILL, Vice Chancellor**

This litigation stems from a failed corporate sale process. Nominal defendant BERA Brand Management, Inc. is an insolvent entity that tried, in vain, to sell itself as a going concern. After the company's prospects collapsed, its assets were sold in an Article 9 sale for pennies on the dollar. Plaintiff CIBC Bank USA—a creditor of BERA—then brought this action.

CIBC seeks to press derivative claims against BERA's board of directors under two primary theories of fiduciary misconduct. First, it alleges that the directors breached their duties to BERA by bypassing viable acquisition offers in pursuit of a higher valuation that would clear a preferred stockholder's liquidation preference. Second, it asserts that the board allowed BERA's CEO to go rogue and sabotage a viable deal. CIBC also brings related aiding and abetting claims against two BERA stockholders and a direct claim for tortious interference with contract.

The defendants moved to dismiss the complaint on three grounds. They argue that CIBC lacks standing to pursue the fiduciary duty claims directly, that—if the claims are derivative—demand is not excused, and that the complaint otherwise fails to state a claim.

I conclude that CIBC's fiduciary duty and aiding and abetting claims are derivative because they allege harm to the corporation itself. Although this classification affords CIBC standing to sue as a creditor, the claims must be dismissed under Court of Chancery Rule 23.1. CIBC advances the novel argument

that creditors deserve a relaxed pleading burden under that rule. Rule 23.1's plain text, however, holds all derivative plaintiffs to the same heightened standard—one that CIBC has not satisfied.

Because CIBC disavows the application of enhanced scrutiny and cites no material conflicts affecting a majority of BERA's directors, it must plead demand futility through particularized facts supporting a reasonable inference that the board acted in bad faith. Stripped of conclusory group pleading, the complaint lacks allegations calling into question the directors' good-faith exercise of business judgment amid BERA's deteriorating financial condition. As for the tortious interference claim, it survives only against BERA's former CEO.

## I.    FACTUAL BACKGROUND

The following facts are drawn from the Verified Amended and Supplemented Complaint (the "Complaint") and documents it incorporates by reference.[1] The well-pleaded facts are presumed true for purposes of resolving the defendants' motions to dismiss.[2]

---

[1] Verified Am. and Supplemented Compl. (Dkt. 34) ("Am. Compl."); *see Freedman v. Adams*, 2012 WL 1345638, at *5 (Del. Ch. Mar. 30, 2012) ("When a plaintiff expressly refers to and heavily relies upon documents in her complaint, these documents are considered to be incorporated by reference into the complaint . . . .").

[2] *See infra* note 190.

## A. BERA and Its Board

Nominal defendant BERA Brand Management Inc. is a Delaware corporation headquartered in New York.[3] Founded in 2013, BERA operates as a software-as-a-service provider.[4]

When this action was filed, BERA had a five-member Board of Directors consisting of BERA's founder and Chief Executive Officer Ryan Barker, former BERA President Jeffrey Peacock, and non-management directors Jim McTaggart, Jim Stengel, and Scott Miller (together, the "Board").[5] Barker, Peacock, McTaggart, and Stengel were among BERA's largest stockholders, holding 28%, 16%, 12%, and 2% of the company's voting power, respectively.[6]

## B. The Credit Agreement

Plaintiff CIBC Bank USA is an arm of the Canadian Imperial Bank of Commerce, a multinational banking and financial services institution.[7] On July 11, 2019, CIBC executed a Credit Agreement with BERA.[8]

---

[3] Am. Compl. ¶ 31.

[4] *Id.* ¶¶ 32-33, 67.

[5] *Id.* ¶¶ 34, 36-39, 41.

[6] *Id.* ¶¶ 34, 36, 38-39.

[7] *Id.* ¶ 30.

[8] *Id.* ¶ 46; Am. Compl. Ex. A ("Credit Agreement").

Under the Credit Agreement, CIBC extended certain revolving loans to BERA.[9] CIBC held a continuing security interest in substantially all of BERA's assets to secure repayment of these loans.[10] BERA was also required to meet minimum revenue and EBITDA thresholds.[11]

The Credit Agreement was amended multiple times, including to acknowledge certain "events of default" starting in 2019.[12] Under the seventh and final amendment, executed on February 15, 2023, CIBC agreed to forbear from exercising its remedies for existing default until July 2023, absent a new default.[13]

### C. Peak's Investment and BERA's Financial Decline

Between 2020 and 2022, BERA held a series of funding rounds.[14] By May 2023, defendant PeakEquity Partners I, L.P.—a private equity fund—had invested over $25 million and held a 26.6% stake in BERA.[15] Peak's shares carried a liquidation preference, entitling it to at least three times its original issue price if

---

[9] Am. Compl. ¶ 46.

[10] Credit Agreement §§ 1.1 (definition of "Collateral"), 8.1 (grant of collateral).

[11] *Id.* § 11.14.1-.2.

[12] Am. Compl. Exs. A.1-A.7; Am. Compl. ¶ 51.

[13] Am. Compl. ¶ 56.

[14] *Id.* ¶¶ 57-60.

[15] *Id.* ¶¶ 42, 60.

BERA were sold or liquidated.[16] Peak also appointed two of its partners—Jim Sheward and Justin Reger (together, the "Peak Directors")—to the Board.[17]

Peak's investment coincided with a period of severe financial decline. Starting in 2020, BERA experienced three consecutive years of negative EBITDA.[18] As the company transitioned to its software-as-a-service business model, its workforce shrank and it lost nearly a third of its customer accounts.[19]

While BERA struggled, CIBC grew concerned about a potential default under the Credit Agreement.[20] On May 15, 2023, CIBC contacted director Reger and another Peak employee to see if Peak would satisfy BERA's debt to CIBC.[21] CIBC recommended that BERA be sold.[22]

By early June 2023, BERA had breached the Credit Agreement's minimum EBITDA covenant.[23] CIBC sent a notice of event of default to BERA, along with a proposed forbearance agreement.[24] It then exercised its rights under the Credit

---

[16] *Id.* ¶ 61.

[17] *Id.* ¶¶ 35, 40-44.

[18] *Id.* ¶ 68.

[19] *Id.* ¶¶ 67, 70.

[20] *Id.* ¶ 71.

[21] *Id.* ¶ 72.

[22] *Id.* ¶ 73.

[23] *Id.* ¶ 74.

[24] *Id.*

Agreement to sweep approximately $2.5 million from BERA's bank accounts to set off the unpaid debt.[25] Afterward, the Board resolved to initiate a sale process for BERA.[26]

### D. The Initial Sale Process

On June 27, 2023, BERA and CIBC executed a Forbearance Agreement, which granted BERA a reasonable opportunity to sell substantially all of BERA's assets and repay its debt.[27] CIBC also re-lent BERA the $2.5 million it had swept via setoff.[28]

BERA hired an outside financial advisor to market and sell BERA by October 31, 2023.[29] By August 18, BERA had received two indications of interest from third parties.[30] As of mid-October, neither indication of interest had progressed beyond the preliminary stages.[31]

On October 18, CIBC learned from Reger and another Peak representative that BERA CEO Barker viewed the two indications of interest as "low ball[s]" that

---

[25] Am. Compl. Ex. B (Notice of Event of Default and Reservation of Rights); Am. Compl. Ex. C (Notice of Acceleration and Setoff); Am. Compl. ¶¶ 74-75.

[26] Am. Compl. ¶ 75.

[27] *Id.* ¶¶ 76-77; Am. Compl. Ex. D ("Forbearance Agreement").

[28] Am. Compl. ¶ 77.

[29] *Id.* ¶¶ 10, 78.

[30] *Id.* ¶ 80.

[31] *Id.*

6

did not reflect BERA's true value.[32]  When CIBC approached Barker, he confirmed that he would not sell BERA for less than $75 million—a valuation high enough to clear Peak's liquidation preference and secure returns for common stockholders, including himself.[33]

A week later, CIBC sent BERA a notice of default under the Forbearance Agreement based on BERA's continuing breach of its minimum EBITDA covenant.[34]  CIBC reserved its right to terminate the Forbearance Agreement and again granted BERA additional time to pursue a sale.[35]

By December 1, no buyer had materialized.[36]  CIBC asked BERA and its financial advisor to expand their outreach and lower their valuation threshold; Barker agreed.[37]  BERA's lead investment banker told CIBC she was confident BERA could be sold for $10 to $15 million.[38]

---

[32] *Id.* ¶ 81.

[33] *Id.* ¶ 82.

[34] *Id.* ¶ 85; Am. Compl. Ex. E (notice of default on the Forbearance Agreement).

[35] Am. Compl. ¶ 85.

[36] *Id.* ¶ 86.

[37] *Id.* ¶ 87.

[38] *Id.* ¶ 88.

### E. The Terminus Offer

In December 2023, Terminus Capital Partners expressed interest in acquiring BERA as a going concern for between $10 and $15 million.[39] It made a written offer to purchase BERA for $7 million on January 8, 2024, and expressed its willingness to partner with Barker post-closing.[40]

The Board reached an impasse over the Terminus offer because it could not agree on how to allocate proceeds.[41] Because the offer would not clear Peak's liquidation preference, certain directors believed the offer was insufficient and could be improved.[42] Barker, meanwhile, refused to support the sale unless he retained additional equity or gained personal proceeds.[43]

BERA's financial situation further deteriorated.[44] In mid-March, BERA's financial advisor told CIBC that it believed Terminus could increase its bid to $10 million.[45] The Board remained deadlocked, and the process stalled.[46]

---

[39] *Id.* ¶ 89.

[40] *Id.* ¶ 91.

[41] *Id.* ¶¶ 92-95.

[42] *Id.* ¶ 100.

[43] *Id.* ¶ 94.

[44] *Id.* ¶¶ 102-03.

[45] *Id.* ¶ 105.

[46] *Id.*

**F.     The Article 9 Sale**

On April 19, 2024, CIBC gave notice that it was proceeding with a secured party sale of BERA's assets pursuant to Article 9 of the Uniform Commercial Code (UCC).[47]  At this point, BERA was insolvent under the balance sheet test.[48]

The Article 9 auction was postponed to mid-June to allow more time for bidding.[49]  By the end of the process, CIBC's financial advisor marketed BERA to 162 parties but received only two non-binding offers.[50]

The first offer, from ESW Holdings, Inc., proposed purchasing BERA's assets for $2.75 million in cash.[51]  ESW indicated it was unlikely to retain BERA's management team.[52]  The second offer, from Hale Capital Partners, LP, proposed paying $3.6 million in cash.[53]  Hale conditioned its offer on retaining BERA's key executive, including Barker, and noted that it might increase its bid after diligence.[54]

---

[47] *Id.* ¶ 109.

[48] *Id.* ¶ 165.

[49] *Id.* ¶¶ 113-14.

[50] *Id.* ¶ 115.

[51] *Id.* ¶ 117.

[52] *Id.*

[53] *Id.* ¶ 118.

[54] *Id.* ¶¶ 119, 120.

CIBC selected Hale's offer because of its materially higher valuation and retention terms.[55]

### G. Barker's Backchanneling

On June 17, 2024—the eve of the Article 9 auction—Hale abruptly declined to bid.[56] Hale explained that Barker had contacted it to propose an $8.5 million investment in BERA at a $25 million valuation.[57] Barker also demanded a revised deal structure with increased equity for management.[58]

CIBC called Miller (an outside BERA director) to report this development. Miller knew Barker contacted Hale but mistakenly believed it concerned an employee option pool.[59] CIBC warned Miller that Barker was jeopardizing the sale.[60]

On June 20, Hale submitted a revised offer for $500,000 in cash plus a five-year, $2 million unsecured payment-in-kind promissory note.[61] When CIBC's financial advisor asked why Hale had drastically reduced its offer, Hale explained

---

[55] *Id.* ¶ 121.

[56] *Id.* ¶ 123.

[57] *Id.* ¶ 124.

[58] *Id.* ¶ 125.

[59] *Id.* ¶ 126.

[60] *Id.*

[61] *Id.* ¶ 128.

that Barker had threatened to block the sale by transferring BERA's key assets and employees to a new entity unless Hale capitulated to his demands.[62]

With Hale's bid slashed, CIBC contacted ESW to gauge its continued interest.[63] ESW floated a price between $2 and $3 million.[64]

CIBC then confronted Barker, who admitted he was prepared to transfer BERA's customer contracts to an entity he controlled called "BERA.ai."[65] In response, CIBC's outside counsel sent a letter to the Board accusing it of stonewalling the Article 9 sale.[66] The Peak Directors resigned from the Board days later.[67]

On June 23, Barker and BERA's Chief Financial Officer told CIBC that the company would soon cease to operate unless CIBC provided an additional loan.[68] Barker refused to fulfill ESW's diligence requests unless CIBC supplied the funds.[69] CIBC tried to broker a meeting between ESW and BERA, to no avail.[70]

---

[62] *Id.* ¶ 129.

[63] *Id.* ¶ 131.

[64] *Id.*

[65] *Id.* ¶ 132.

[66] *Id.* ¶¶ 136-37; Am. Compl. Ex. F (June 20, 2024 letter).

[67] Am. Compl. ¶ 137.

[68] *Id.* ¶ 139.

[69] *Id.* ¶ 140.

[70] *Id.* ¶ 141.

11

## H.     The Auction

On June 25, 2024, the Board notified CIBC that it voted to liquidate BERA because no going-concern buyer emerged.[71]  CIBC scheduled the Article 9 auction for June 28.[72]

At the auction, the Stagwell Group—through an affiliate, Harris Acquisitions, LLC—purchased BERA's assets for approximately $650,000.[73]  As a result, BERA satisfied only $650,000 of the over $7 million it owed CIBC under the Credit Agreement.[74]  BERA also incurred an additional $470,000 in debt for CIBC's legal fees related to the sale.[75]

On June 28, Harris filed a certificate of formation with the Delaware Secretary of State for "Harris Acquisitions LLC."[76]  On August 16, Harris changed the company's legal name to "BERA.ai LLC."[77]  As of the time the Complaint was filed, BERA.ai's website listed Barker as its founder and CEO.[78]

---

[71] *Id.* ¶ 143.

[72] *Id.* ¶ 144.

[73] *Id.* ¶¶ 145-46.

[74] *Id.* ¶ 147.

[75] *Id.* ¶ 150; *see also* Credit Agreement § 14.5.

[76] Am. Compl. ¶ 158.

[77] *Id.* ¶ 159.

[78] *Id.*  In addition to the five current Board members, CIBC also named Peak Directors Reger and Sheward as defendants.

## I.    This Litigation

On September 20, CIBC filed this action on behalf of nominal defendant BERA against BERA's current and former directors and Peak.[79]  The operative Complaint advances five counts: breach of fiduciary duty against Barker (Count I) and Sheward, Stengel, Miller, McTaggart, Peacock, and Reger (Count II); aiding and abetting breaches of fiduciary duty against Peak (Count III) and against Barker in his capacity as a stockholder (Count IV); and tortious interference with contractual relations against Peak and Barker (Count V).[80]

The five current Board members and BERA moved to dismiss the Complaint on May 13.[81]  Peak and the Peak Directors filed a separate motion to dismiss and

---

[79] Dkt. 1.

[80] Am. Compl. ¶¶ 192-226.

[81] Dkt. 36; *see* Defs. Barker, Stengel, Miller, McTaggart, Peacock, and Nominal Def. BERA Brand Management, Inc.'s Mot. to Dismiss the Verified Am. and Supplemented Compl. (Dkt. 42) ("Board Defs.' Opening Br.").

joinder.[82]  After briefing was complete,[83] the court heard oral argument on February 26, and the motions were taken under advisement.[84]

## II.   LEGAL ANALYSIS

The defendants have moved to dismiss CIBC's derivative claims (Counts I through IV) under Court of Chancery Rule 23.1 for failure to plead demand excusal, and the entirety of the Complaint under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.[85]

I begin with the threshold question of whether Counts I through IV are direct or derivative, which requires first determining whether the claims sound in contract or tort.  I conclude that these counts are appropriately styled as derivative, fiduciary duty claims.  Because CIBC failed to adequately plead that a demand on the Board would have been futile, Counts I through IV are dismissed under Rule 23.1.  As for the direct tortious interference claim in Count V, it fails against Peak and is dismissed

---

[82] Dkt. 37; Peak Defs.' Joinder and Opening Br. in Supp. of Mot. to Dismiss the Verified Am. and Supplemented Compl. (Dkt. 43) ("Peak Defs.' Opening Br.").

[83] Pl.'s Omnibus Answering Br. in Opp'n to Defs.' Mots. to Dismiss the Verified Am. and Supplemented Compl. (Dkt. 48) ("Pl.'s Opp'n Br."); Defs. Barker, Stengel, Miller, McTaggart, Peacock, and Nominal Def. Bera Brand Management, Inc.'s Reply Br. in Further Supp. of Mot. to Dismiss Pl.'s Verified Amended and Supplemented Compl. (Dkt. 52) ("Board Defs.' Reply Br."); Peak Defs.' Joinder and Reply Br. in Further Supp. of Mot. to Dismiss the Verified Am. and Supplemented Compl. (Dkt. 53) ("Peak Defs.' Reply Br.").

[84] Dkt. 59.

[85] Board Defs.' Opening Br. 1, 3-4; Peak Defs.' Opening Br. 4.

under Rule 12(b)(6), but survives against Barker.  The Complaint is thus dismissed in its entirety, except for Count V as asserted against Barker.

## A.      Direct or Derivative

CIBC purports to bring breach of fiduciary duty and aiding and abetting claims derivatively as the creditor of an insolvent company.[86]   Under *North American Catholic Educational Programming Foundation, Inc. v. Gheewalla*, a creditor of an insolvent corporation has standing to pursue derivative—not direct— breach of fiduciary duty claims.[87]  Accordingly, if Counts I through IV are direct, they must be dismissed for lack of standing.[88]

Before resolving whether these claims are direct or derivative, I pause to address the defendants' argument that Counts I, II, and IV concern breaches of contract.[89]   Relying on *Nemec v. Shrader*, the defendants assert that CIBC is improperly bootstrapping BERA's failure to repay its debt under the Credit and Forbearance Agreements into breaches of fiduciary duty.[90]  In *Nemec*, the Delaware

---

[86] Board Defs.' Opening Br. 1-2, 12; Peak Defs.' Opening Br. 18.

[87]  930 A.2d 92, 103 (Del. 2007) (holding that "individual *creditors* of an *insolvent* corporation have *no right to assert direct* claims for breach of fiduciary duty against corporate directors" but "may nonetheless protect their interest by bringing derivative claims").

[88] *See Vichi v. Koninklijke Philips Elecs. N.V.*, 2009 WL 4345724, at *20-21 (Del. Ch. Dec. 1, 2009) (dismissing an aiding and abetting claim brought by a creditor because the underlying breach of fiduciary duty claim was direct, not derivative).

[89] Board Defs.' Opening Br. 7-11.

[90] *Id.* at 9; Board Defs.' Reply Br. 4.

Supreme Court affirmed the dismissal of a fiduciary duty claim because a stock plan governed the disputed repurchase.[91]

The obligations at issue here are not "expressly addressed by contract."[92] CIBC's claims do not concern untimely payments or missed EBITDA thresholds.[93] Rather, the Complaint centers on the Board's alleged failure to pursue a value-maximizing transaction and Barker's purported prioritization of personal financial gain over BERA's interests.[94] These contentions concern fiduciary obligations owed by BERA's directors and officers, independent of any contract.[95] Thus, Counts I, II, and IV are fairly viewed as fiduciary duty-based claims.

Turning to whether the claims are direct or derivative, I must "look beyond the labels used to describe the claim, evaluating instead the nature of the wrong alleged."[96] Under *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, this determination rests "solely on the following questions: (1) who suffered the alleged harm (the

---

[91] *Nemec v. Shrader*, 991 A.2d 1120, 1129 (Del. 2010).

[92] *Id.*; *see* Pl.'s Opp'n Br. 20-21.

[93] *See, e.g.*, Credit Agreement §§ 6.1, 11.14.2.

[94] Am. Compl. ¶¶ 192-206, 212-16.

[95] The defendants assert that CIBC's tortious interference claim is an implicit concession that this is a contract dispute. *See* Board Defs.' Opening Br. 10-11. The existence of overlapping contractual rights does not necessarily extinguish independent fiduciary duties. *See, e.g.*, *Nemec*, 991 A.2d at 1129.

[96] *Sciabacucchi v. Liberty Broadband Corp.*, 2018 WL 3599997, at *7 (Del. Ch. July 26, 2018).

corporation or suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?"[97] Both *Tooley* factors confirm that CIBC's breach of fiduciary duty and aiding and abetting claims are derivative. The alleged harm is BERA's loss in enterprise value—one suffered by the corporation itself. Any recovery would flow to BERA in the first instance.

### 1. Who Suffered the Alleged Harm?

CIBC contends that BERA sustained a loss of $6.35 million—representing the difference between Terminus's $7 million going-concern offer and the $650,000 liquidation sale to Stagwell, plus $470,000 in legal and professional fees.[98] The director defendants insist that this loss fell directly on CIBC rather than derivatively on BERA. They advance three arguments in support: (1) the $6.35 million figure matches the amount owed to CIBC under the Credit Agreement after the Article 9 sale; (2) the $470,000 in legal and professional fees were triggered by an obligation in the Credit Agreement; and (3) the claims are direct under *Revlon*.[99] None of the defendants' arguments succeed.

---

[97] 845 A.2d 1031, 1033 (Del. 2004).

[98] *See* Am. Compl. ¶¶ 147-48, 150.

[99] Board Defs.' Opening Br. 14; Board Defs.' Reply Br. 3.

First, destroying the value of BERA by rejecting value-maximizing transactions is a "classically derivative" injury to the corporation from corporate mismanagement.[100] Barker and BERA's other directors allegedly "operate[d] to injure the firm in the first instance by reducing its value . . . ."[101] They indirectly harmed CIBC "by diminishing the value of the firm and therefore the assets from which the creditors may satisfy their claims."[102] A creditor's claims do not become direct simply because it suffered a harm secondary to the corporation's.[103] Since any injury to CIBC is "dependent on an injury" to BERA, the alleged harm is derivative in nature.[104]

Second, CIBC's request for $470,000 in fees does not indicate a direct harm. The fees are sought as damages to BERA—not CIBC.[105] BERA allegedly incurred

---

[100] *See Prod. Res. Gp., L.L.C. v. NCT Gp., Inc.*, 863 A.2d 772, 776 (Del. Ch. 2004) ("Some of PRG's fiduciary duty claims rest largely on generalized and conclusory assertions that NCT's board and officers have mismanaged the firm. Claims of this type are classically derivative . . . ."); *N. Am. Cath. Educ. Programming Found., Inc. v. Gheewalla*, 2006 WL 2588971, at *18 (Del. Ch. Sep. 1, 2006) (same), *aff'd*, 930 A.2d 92 (Del. 2007); *see also* Donald J. Wolfe, Jr. & Michael A. Pittenger, 2 *Corporate and Commercial Practice in the Delaware Court of Chancery* § 11.02 at 11-9 (2d ed. updated Jan. 2025) ("Claims brought by creditors of an insolvent corporation for breach of fiduciary duty on the part of the directors for harming the economic value of the firm have . . . been characterized as derivative.").

[101] *Prod. Res.*, 863 A.2d at 776.

[102] *Id.*

[103] *See Gheewalla*, 930 A.2d at 101 (noting that when a corporation is insolvent, "creditors take the place of the shareholders" in enforcing the fiduciary obligations of directors).

[104] *Brookfield Asset Mgmt. v. Rosson*, 261 A.3d 1251, 1263 (Del. 2021).

[105] Am. Compl. ¶ 150.

this additional debt due to the Board's mismanagement of the sale process. It is dependent on the primary injury to BERA.[106]

Third, the defendants incorrectly characterize Counts I through IV as direct claims under *Revlon*.[107] Although the defendants stress that challenges to a sale of control are inherently direct, they draw the wrong distinction.[108] CIBC is not claiming that BERA's directors deprived stockholders of a fair share of merger consideration or a control premium. Rather, it alleges that fiduciaries derailed transactions that would have preserved BERA's remaining enterprise value. When a corporation "suffer[s] harm in the form of inadequate consideration for the sale of itself as a going concern," any harm to equity holders "is only a natural and foreseeable consequence of the harm to the corporation."[109] CIBC's losses as a creditor are likewise a natural consequence of the primary harm experienced by BERA.

---

[106] *See Brookfield*, 261 A.3d at 1263.

[107] *See Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173 (Del. 1986).

[108] *See Brookfield*, 261 A.3d at 1276 (noting that *Revlon* "provide[s] a basis for a direct claim for stockholders to address fiduciary duty violations in a change of control context"); *El Paso Pipeline GP Co. v. Brinckerhoff*, 152 A.3d 1248, 1266 (Del. 2016) (Strine, C.J., concurring) ("*Revlon* already accords a direct claim to stockholders when a transaction shifts control of a company from a diversified investor base to a single controlling stockholder.").

[109] *Agostino v. Hicks*, 845 A.2d 1110, 1119 (Del. Ch. 2004).

19

### 2. Who Would Receive the Benefit of Any Recovery?

CIBC purports to seek damages on behalf of BERA.[110] The defendants maintain that CIBC, as BERA's creditor, would receive the funds in satisfaction of BERA's debt.[111] As a result, they maintain that any recovery truly flows to CIBC.

Under the second prong of *Tooley*, "[w]here all of a corporation's stockholders are harmed and would recover *pro rata* in proportion with their ownership of the corporation's stock solely because they are stockholders, then the claim is derivative in nature."[112] This inquiry concerns the nature of the legal recovery—not the downstream economic destination of the funds.[113] Claims of corporate mismanagement that destroy enterprise value are classically derivative because the corporation is the initial beneficiary of any recovery.[114] Corporate insolvency, and the reality that a creditor may ultimately capture the recovered funds, does not transform a derivative claim into a direct one.

---

[110] Am. Compl., Prayer for Relief.

[111] Board Defs.' Opening Br. 14.

[112] *El Paso*, 152 A.3d at 1261.

[113] *See Prod. Res.*, 863 A.2d at 792 ("[R]egardless of whether they are brought by creditors when a company is insolvent, these claims remain derivative, with either shareholders or creditors suing to recover for a harm done to the corporation as an economic entity and any recovery logically flows to the corporation and benefits the derivative plaintiffs indirectly to the extent of their claim on the firm's assets.").

[114] *Id.* ("In other words, even in the case of an insolvent firm, poor decisions by directors that lead to a loss of corporate assets and are alleged to be breaches of equitable fiduciary duties remain harms to the corporate entity itself.").

20

Because CIBC's claims center on BERA's lost enterprise value, it cannot "prevail without showing an injury to the corporation."[115]  Counts I through IV of CIBC's complaint are derivative, and CIBC has equitable standing to assert them on BERA's behalf.

## B.    Demand Futility

To pursue its derivative claims in Counts I through IV, CIBC was required to make a demand on BERA's Board or adequately plead that doing so would have been futile.[116]  It chose the latter path.[117]

"Rule 23.1 requires that a plaintiff who asserts demand futility must 'comply with stringent requirements of factual particularity that differ substantially from the permissive notice pleadings governed solely by Chancery Rule 8(a).'"[118]  The court "is confined to the well-pleaded allegations in the Complaint, the documents incorporated into the Complaint by reference, and facts subject to judicial notice . . . ."[119]  The facts are evaluated "in their totality," and all reasonable

---

[115] *Brookfield*, 261 A.3d at 1266 (citation omitted).

[116] *See* Ct. Ch. R. 23.1(a).

[117] *See* Am. Compl. ¶ 180 (alleging that a demand would have been futile).

[118] *In re INFOUSA, Inc. S'holders Litig.*, 953 A.2d 963, 985 (Del. Ch. 2007) (citation omitted); *see also Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000) (explaining that Rule 23.1 creates "stringent requirements of factual particularity").

[119] *In re Kraft Heinz Co. Deriv. Litig.*, 2021 WL 6012632, at *4 (Del. Ch. Dec. 15, 2021) (citing *White v. Panic*, 783 A.2d 543, 546-47 (Del. 2001)), *aff'd*, 282 A.3d 1054 (Del. 2022) (TABLE).

21

inferences are drawn in the plaintiff's favor.[120]  The court will reject "conclusory allegations" or "inferences that are not objectively reasonable[.]"[121]

Before addressing whether the Complaint meets this standard, I first consider whether creditors are subject to the heightened pleading requirement of Rule 23.1. The defendants aver that all derivative plaintiffs—stockholders and creditors alike— must plead demand futility with particularity.[122]  CIBC, for its part, posits that creditors should be held to a lower pleading standard.[123]  After resolving this issue, I evaluate whether CIBC has satisfied its burden.

### 1.    Application of Rule 23.1 to Creditors

CIBC makes the novel argument that, as a creditor, its demand futility allegations should be evaluated under a lesser pleading burden.  It proposes various alternatives, including the Rule 12(b)(6) reasonable conceivability standard, an adaptation of Rule 23.1, or the plausibility standard applied by bankruptcy courts.[124]

---

[120] *Del. Cnty. Empls. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1019 (Del. 2015).

[121] *In re GoPro, Inc.*, 2020 WL 2036602, at *8 (Del. Ch. Apr. 28, 2020) (citation omitted).

[122] *See* Board Defs.' Reply Br. 5-7.

[123] *See* Pl.'s Opp'n Br. 28-34.

[124] *See id*. at 34-39.

Both the underpinnings of Delaware corporate law and the plain text of Rule 23.1 foreclose this argument.

The parties agree that creditors are subject to the demand futility doctrine.[125] Demand futility is anchored in the bedrock substantive principle under 8 *Del. C.* §141(a) that directors—not stockholders or creditors—manage the business and affairs of the corporation.[126] Section 141(a) "does not distinguish between stockholders, creditors, or other corporate constituencies."[127] And Rule 23.1 is the "procedural embodiment of this substantive principle of corporation law."[128] It follows that, to preserve a board's "prerogative to decide how to handle a corporate claim,"[129] creditors asserting derivative claims must comply with the demand futility doctrine.

Rule 23.1's text confirms this application. It provides that "[t]he complaint *in a derivative action* must . . . state with particularity . . . any effort *by the derivative plaintiff* to obtain the desired action from the entity" and "the reasons for not

---

[125] *See id.* at 31; Board Defs.' Reply Br. 5.

[126] *See* 8 *Del. C.* § 141(a); *Spiegel v. Buntrock*, 571 A.2d 767, 772-73 (Del. 1990) ("A basic principle of the General Corporation Law of the State of Delaware is that directors, rather than shareholders, manage the business and affairs of the corporation.").

[127] *Quadrant Structured Prods. Co. v. Vertin*, 102 A.3d 155, 182 (Del. Ch. 2014).

[128] *Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993).

[129] *Quadrant*, 102 A.3d at 181.

obtaining the action or not making the effort."[130] The rule does not distinguish between stockholders and creditors; it applies to "a derivative action" brought by a "derivative plaintiff."[131] There is no textual basis for exempting creditors from Rule 23.1's stringent pleading requirements.[132]

Nevertheless, CIBC offers two reasons for holding creditors to a relaxed burden for pleading demand futility.[133] Both arguments are unavailing.

First, CIBC asserts that because creditors lack information rights under 8 *Del. C.* § 220, they are disadvantaged when attempting to satisfy Rule 23.1's particularity standard.[134] That argument ignores that commercial lenders can protect themselves by contract. CIBC did precisely that, bargaining for extensive information rights in the Credit Agreement.[135]

---

[130] Ct. Ch. R. 23.1(a)(1) (emphasis added).

[131] *Id.*

[132] Given that the rule is unambiguous, I decline to consider the legislative history that CIBC cites in support of its reading. Delaware courts interpret rules of procedure using the same principles applied to statutory construction. *See In re Petition of State*, 708 A.2d 983, 988 n.17 (Del. 1998) (citing *Greco v. State*, 701 A.2d 419, 421 (Md. 1997)). Under these principles, if the court "determines that a statute is unambiguous, [it] give[s] the statutory language its plain meaning." *Sussex Cnty. Dep't of Elections v. Sussex Cnty. Republican Comm.*, 58 A.3d 418, 422 (Del. 2013).

[133] Pl.'s Opp'n Br. 31, 33.

[134] *Id.* at 31-33; *see* 8 *Del. C.* § 220(b)(1) (noting that "any *stockholder* . . . shall . . . have the right during the usual hours for business to inspect for any proper purpose" certain books and records of the corporation (emphasis added)).

[135] Credit Agreement § 10.1.1-2 (requiring BERA to provide, among other things, consolidated balance sheets and statements of earnings and cash flows on an annual and monthly basis); *id.* § 10.1.5 (requiring BERA to provide financial projections); *id.* § 10.1.6

Second, CIBC suggests that insolvency inherently compromises a director's impartiality. It believes that such directors are less receptive to a demand "when the corporation's financial condition has weakened its ability to provide indemnification and insurance."[136] Relatedly, CIBC asserts that directors of an insolvent corporation may have clouded judgment because they face the prospect of losing their roles.[137] But Delaware law already accounts for these dynamics. If a director faces a substantial likelihood of personal liability on a non-exculpated claim and lacks indemnification, for example, that director will be deemed interested.[138]

There is no ground—textual or equitable—for lowering the pleading standard when creditors pursue derivative claims. Rule 23.1's requirements apply to any "derivative action" brought by any "derivative plaintiff."[139] CIBC is not exempt.

(requiring BERA to provide "upon reasonable request by Lender, such other financial statements, tax returns, and other information . . . relating to the affairs" of BERA); *id.* § 10.2 (authorizing CIBC to inspect BERA's books and records). CIBC also acknowledges that it had real-time access to BERA's management and financial advisor. *See, e.g.*, Am. Compl. ¶ 126 (alleging CIBC called defendant Miller to discuss threats to the Hale deal); *id.* ¶ 88 (referencing discussion between CIBC and BERA's financial advisor).

[136] Pl.'s Opp'n Br. 33-34 (quoting *Prod. Res.*, 863 A.2d at 796).

[137] *Id.*

[138] *See United Food & Com. Workers Union & Participating Food Indus. Empls. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1059 (Del. 2021).

[139] Ct. Ch. R. 23.1(a)(1).

## 2. The *Zuckerberg* Analysis

When this suit was filed, the Board had five members: Barker, Stengel, Miller, McTaggart, and Peacock.[140]  To excuse demand, CIBC must successfully challenge the impartiality of at least three of these directors.  Under *United Food & Commercial Workers Union v. Zuckerberg*, the court must consider:

> (i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;
>
> (ii) whether the director faces a substantial likelihood of liability on any of the claims that are the subject of the litigation demand; and
>
> (iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that is the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.[141]

This inquiry is done on a "director-by-director" basis.[142]  "[I]f the answer to any of the questions is 'yes' for at least half of the members of the demand board," then demand is excused as futile.[143]

---

[140] Am. Compl. ¶ 41.  The Peak Directors, Sheward, and Reger departed before this litigation was filed.  *Id.* ¶¶ 35, 40.

[141] *Zuckerberg*, 262 A.3d at 1059.

[142] *Id*.

[143] *Firemen's Ret. Sys. of St. Louis ex rel. Marriott Int'l, Inc. v. Sorenson*, 2021 WL 4593777, at *7 (Del. Ch. Oct. 5, 2021) (confirming that the court "counts heads" to determine whether a board majority is "disinterested and independent" (citation omitted)).

CIBC invokes only the first and second *Zuckerberg* prongs.[144] It does not allege that any Board members lack independence from a conflicted party.[145] Because CIBC fails to plead with particularity that three of the five Board members—Miller, McTaggart, and Peacock (the "Demand Majority")—received a material personal benefit from the misconduct or face a substantial likelihood of liability, demand is not excused. Counts I through IV are therefore dismissed under Rule 23.1.

### a. Material Personal Benefit

A director is disabled for demand futility purposes if she received a material personal benefit from the wrongdoing that was not shared equally with the stockholders.[146] "Materiality means the alleged benefit was significant enough in the context of the director's economic circumstances, as to have made it improbable

---

[144] Am. Compl. ¶¶ 183-87. Although CIBC's answering brief states that Miller stood to receive a material personal benefit, the Complaint only alleges that Miller faces a substantial likelihood of liability. *See id.* ¶ 185.

[145] *Id.* ¶¶ 183-87.

[146] *See Rales*, 634 A.2d at 936 ("A director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders.").

that the director could perform her fiduciary duties to the . . . shareholders without being influenced by her overriding personal interest."[147]

CIBC contends that McTaggart and Peacock sought a personal benefit by "infighting" over the Terminus offer in pursuit of better personal returns.[148] CIBC's argument relies on a general allegation that "BERA's directors . . . believed Terminus's $7 million offer provided them with an insufficient return."[149] This group pleading fails Rule 23.1's particularity requirement.[150]

More fundamentally, the first *Zuckerberg* prong asks whether the directors "*received* a material personal benefit" from the alleged misconduct.[151] CIBC alleges only that the directors *sought* a better personal return by letting the Terminus deal go. The Complaint does not say that McTaggart or Peacock received any such benefit, let alone one that is material relative to their personal economic circumstances. Indeed, the Terminus deal failed, BERA's assets were sold for a

---

[147] *Orman v. Cullman*, 794 A.2d 5, 23 (Del. Ch. 2002) (citation omitted).

[148] Pl.'s Opp'n Br. 43-45.

[149] Am. Compl. ¶¶ 93, 100.

[150] *See In re AmTrust Fin. Servs., Inc. S'holder Litig.*, 2020 WL 914563, at *13-14 (Del. Ch. Feb. 26, 2020) (dismissing claims against one of four directors where there were "few allegations in the Complaint specifically about" that director); *Howland v. Kumar*, 2019 WL 2479738, at *5 (Del. Ch. June 13, 2019) (dismissing claim against officer where "the Complaint lumps [the officer] in with the other Individual Defendants" and contains "no well-pled facts sufficient to suggest any wrongdoing by [the officer]").

[151] *Zuckerberg*, 262 A.3d at 1059 (emphasis added).

fraction of what the Board initially expected, and the directors' equity was wiped out.

Because the Complaint fails to allege that any member of the Demand Majority received a material personal benefit from the misconduct, demand is not excused on that basis.

b.      Substantial Likelihood of Liability

A director cannot impartially consider a demand if her "potential for liability is not 'a mere threat' but instead may rise to 'a substantial likelihood.'"[152] CIBC argues that the Board members face liability for (1) value-destructive decisions that harmed BERA's residual claimants by scuttling value-maximizing transactions, and (2) allowing Barker to thwart the sale process.[153] BERA's certificate of incorporation contains an exculpation provision under 8 *Del. C.* § 102(b)(7). Consequently, CIBC must plead particularized facts supporting a reasonable inference that the directors acted disloyally or in bad faith to demonstrate that they face a substantial likelihood of liability.[154] It has not done so as to Miller, McTaggart, or Peacock.

---

[152] *Rales*, 634 A.2d at 936 (holding that directors cannot impartially consider a demand if they face a "substantial likelihood" of personal liability).

[153] Am. Compl. ¶¶ 192-206; Pl.'s Opp'n Br. 43-46.

[154] *See* Board Defs.' Opening Br. Ex. 1 (certificate of incorporation). The court may take judicial notice of this exculpatory provision. *See TVI Corp. v. Gallagher*, 2013 WL 5809271, at *14 (Del. Ch. Oct. 28, 2013); 8 *Del. C.* § 102(b)(7).

i. *The Failed Transactions*

CIBC's first theory is that the Board's failure to pursue the proposed transactions with Terminus, Hale, and ESW can only be explained by bad faith.[155] It asserts that because Peak's liquidation preference put other stockholders "out of the money," the directors irrationally bypassed viable deals in the hope of a windfall at the expense of BERA's enterprise value.[156] To assess whether the Demand Majority faces a substantial likelihood of liability on this claim, I begin with the standard of review.

Entire fairness is inapplicable because CIBC has not pleaded that a Board majority was materially interested or lacked independence.[157] And although the Complaint concerns a failed sale process, CIBC expressly disavows a *Revlon* claim.[158] It instead challenges the Board's decision to seek higher valuations rather

---

[155] Pl.'s Opp'n Br. 46-47.

[156] Am. Compl. ¶¶ 62-65, 100, 105, 185-87; Pl.'s Opp'n Br. 43-46.

[157] *See supra* notes 144-145 and accompanying text; *see also supra* Section II.B.2.a.

[158] *See* Tr. of Feb. 26, 2026 Oral Arg. on Defs.' Mots. to Dismiss (Dkt. 60) ("Hr'g Tr.") 46 ("We heard a bit about *Revlon* in our briefs and today. This is a distraction."); *see also id.* at 47 (describing CIBC's claim as concerning the Board allowing BERA's "melting ice cube" of assets to deplete). The defendants argue that CIBC made this concession strategically because a *Revlon* claim cannot be brought derivatively by creditors under *Gheewalla*. *See* Board Defs.' Opening Br. 14. As recognized in *Agostino v. Hicks*, however, a claim that a corporation suffered harm in the form of inadequate consideration for the sale of itself as a going concern is derivative. 845 A.2d at 1119. Perhaps CIBC backed away from *Revlon* to avoid this standing dispute. But in doing so, it framed the challenged conduct as a business judgment on whether to continue pursuing higher-value opportunities.

than accept early proposals. At bottom, CIBC's claim targets the Board's judgment that continuing negotiations in pursuit of greater enterprise value was preferable to accepting proposals it deemed inadequate.[159]

The business judgment rule applies equally to directors of solvent and insolvent corporations (outside of bankruptcy proceedings).[160] Delaware law imposes "no absolute obligation on the board of a company that is unable to pay its bills to cease operations and to liquidate."[161] Rather, directors may, "in the appropriate exercise of their business judgment, take action that might, if it does not pan out, result in the firm being painted in a deeper hue of red."[162]

Given CIBC's eschewal of enhanced scrutiny, to survive BERA's exculpatory charter provision, it must allege that the Board acted in bad faith.[163] CIBC must plead with particularity that the directors "intentionally fail[ed] to act in the face of

---

[159] *See Quadrant*, 102 A.3d at 185 (holding that the board of an insolvent corporation was not required to "manage towards a near-term dissolution for the benefit of creditors").

[160] *See Prod. Res.*, 863 A.2d at 788 n.52 (explaining that the business judgment rule "provides directors with the ability to make a range of good faith, prudent judgments about the risks they should undertake on behalf of troubled firms"); *Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*, 906 A.2d 168, 174 (Del. Ch. 2006) (applying the business judgment rule to the board of an insolvent corporation), *aff'd sub nom. Trenwick Am. Tr. v. Billett*, 931 A.2d 438 (Del. 2007) (TABLE).

[161] *Trenwick*, 906 A.2d at 204.

[162] *Id.* at 174.

[163] *See In re Cornerstone Therapeutics, Inc. S'holder Litig.*, 115 A.3d 1173, 1180 (Del. 2015). Even if enhanced scrutiny applied, the Complaint lacks particularized allegations that the Demand Majority acted for an improper purpose, favored a conflicted bidder, or consciously undermined the sale process.

31

a known duty to act, demonstrating a conscious disregard for [their] duties."[164]  It has not done so as to the Demand Majority.

CIBC's central contention—that the Board disloyally failed to accept value-enhancing offers—rests "upon information and belief."[165]  The Complaint makes broad statements about the "Director Defendants," but no particularized allegations about what Miller, McTaggart, or Peacock individually knew, said, or did in connection with the collapse of the Terminus offer.[166]  Such assertions fail the particularity requirement of Rule 23.1.[167]

Stripped of these conclusory allegations, the well-pleaded facts fall short of the high bar required to plead bad faith.  The Complaint concedes that the directors held meetings, reviewed BERA's financial performance, and only formally resolved to liquidate the company when no viable going-concern buyers remained.[168]  It

---

[164] *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 755 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006).

[165] *See* Am. Compl. ¶¶ 12, 93-94, 96.

[166] *See*, *e.g.*, *id.* ¶¶ 93, 96-97, 99, 107, 204.

[167] *See In re Xura, Inc. S'holder Litig.*, 2019 WL 3063599, at *3 (Del. Ch. July 12, 2019) (observing that, at the lower Rule 12(b)(6) standard, "[p]leading serial facts 'on information and belief' is no substitute for well-pled facts that will support a reasonable inference of wrongdoing"); *In re ProAssurance Corp. S'holder Deriv. Litig.*, 2023 WL 6426294, at *18 (Del. Ch. Oct. 2, 2023) (holding that a "generalized allegation" of "group pleading" about "all" directors fell "well short of the particularity standard" of Rule 23.1); *see also* Ct. Ch. R. 23.1.

[168] Am. Compl. ¶¶ 91, 110, 143, 185-86.

further acknowledges that Barker's $75 million demand predated the Board's decision to revamp the sale process at a lower valuation.[169]

CIBC insists otherwise, arguing that it was unreasonable for the Board to expect a valuation that would clear Peak's liquidation preference given BERA's struggles.[170] But Delaware law does not require directors of an insolvent corporation to abandon efforts to maximize enterprise value simply because creditors stand to capture any incremental recovery.[171] Even accepting that the Board wished to clear Peak's liquidation preference to generate a return for junior stockholders, that goal aligns with maximizing BERA's value.[172] That BERA failed to close a going-concern sale and ultimately liquidated does not mean that the directors acted in bad faith when evaluating earlier proposals.[173] Miller, McTaggart, and Peacock do not face a substantial likelihood of liability on this basis.

[169] *Id.* ¶ 87.

[170] *See* Pl.'s Opp'n Br. 40; Am. Compl. ¶ 84.

[171] *See Trenwick*, 906 A.2d at 174 (holding that the fact that the residual claimants are creditors "does not mean that the directors cannot choose to continue the firm's operations in the hope that they can expand the inadequate pie such that the firm's creditors get a greater recovery").

[172] *See Globis P'rs, L.P. v. Plumtree Software, Inc.*, 2007 WL 4292024, at *8 (Del. Ch. Nov. 30, 2007) (holding that the acceleration of unvested options and the cash-out of vested options did not create a disabling interest because the directors' interests "are aligned [with shareholders] in obtaining the highest price").

[173] *See Pettry ex rel. FedEx Corp. v. Smith*, 2021 WL 2644475, at *8 n. 91 (Del. Ch. June 28, 2021) (holding that "quibbles" with the board's approach "amount to nothing more than a disagreement about the merits of a deliberate decision . . . and f[e]ll well short

ii.     *Deficient Oversight of Barker*

CIBC's other theory seeks to hold the Board liable for failing to oversee Barker during the sale process. CIBC alleges that Barker went rogue, engaging in what it calls "corporate arson"—conducting unauthorized backchannel negotiations, threatening a key bidder (Hale), and attempting to orchestrate asset transfers that caused BERA to lose a favorable sale.[174] CIBC contends that the Board members breached their fiduciary duties "by failing to cabin Barker's known bad-faith conduct."[175]

CIBC denies advancing a *Caremark* claim.[176] Rather, it asserts that the directors "failed to exercise any control over Barker or take any steps to remediate Barker's actions that were in conflict with BERA's best interests."[177] To plead that the Demand Majority knew of and deliberately ignored Barker's misconduct, CIBC relies on a June 20, 2024 letter it sent to the Board and a conversation its principal had with Miller—both expressing concern that Barker was thwarting the sale.[178]

---

of supporting an inference of bad faith" in the context of evaluating strategic alternatives), *aff'd*, 273 A.3d 750 (Del. 2022).

[174] *See* Am. Compl. ¶¶ 15, 123-29; *see* Pl.'s Opp'n Br. 40.

[175] Pl.'s Opp'n Br. 50.

[176] *Id.* at 50 n. 195 (citing *In re El Paso Corp. S'holder Litig.*, 41 A.3d 432, 434 (Del. Ch. 2012) and *Chester Cnty. Empls.' Ret. Fund v. KCG Hldgs., Inc.*, 2019 WL 2564093, at *17-18 (Del. Ch. June 21, 2019)).

[177] Am. Compl. ¶ 204.

[178] *Id.* ¶¶ 126-27, 185-87.

These facts do not support a reasonable inference that the Demand Majority faces a substantial likelihood of liability for several reasons.

First, CIBC again relies on "group pleading" to impute bad faith to Miller, McTaggart, and Peacock.[179] It speculates that the directors must have known about Barker's actions based on their "attendance at Board meetings and participation in the management of the Company."[180] There are no specific allegations in the Complaint regarding what McTaggart and Peacock each knew or did. And as discussed below, the sole specific allegation about Miller is insufficient.

Second, the timeline described in the Complaint defeats CIBC's reliance on its letter to the Board. The Board could not have acted in bad faith by allowing the Hale deal to unravel based on a letter received after the offer was already lost.[181] The Board's refusal to capitulate to CIBC's demands after receiving the letter also does not support an inference of bad faith inaction.[182]

---

[179] *See supra* note 150; *see also In re Essendant, Inc. S'holder Litig.*, 2019 WL 7290944, at *7 n.91 (Del. Ch. Dec. 30, 2019) (noting that "group pleading is not sufficient to state a claim of breach of duty against an individual fiduciary").

[180] Am. Compl. ¶¶ 185-87. CIBC repeatedly cites the same set of allegations to emphasize the Board's purported inaction. Pl.'s Opp'n Br. 43-45 nn. 172, 175, 178 (citing Am. Compl. ¶¶ 19, 81, 93-97, 103-05, 110, 126-27, 137, 160). The allegations are no more successful in those other paragraphs. None address individual directors, except for the single conversation CIBC had with Miller.

[181] Am. Compl. ¶¶ 15, 123-28 (noting that Barker's attempt at "corporate arson" occurred the night before the scheduled auction of BERA on June 17, 2024).

[182] *See Walt Disney*, 907 A.2d at 755 (holding that bad faith requires an intentional dereliction of duty, not merely a failure to act as the plaintiff would have preferred);

Finally, the sole director-specific allegation of scienter—CIBC's conversation with Miller—is insufficient to plead that Miller faces a substantial likelihood of liability. CIBC asserts it told Miller that Barker's backchannel negotiations "were putting the sale at risk."[183] But it does not follow that Miller's subsequent failure to manage Barker's negotiations to CIBC's liking indicates disloyalty or bad faith.[184] At worst, Miller's misimpression of Barker's communications and subsequent lack of intervention after CIBC corrected him would constitute an exculpated breach of the duty of care.[185]

*      *      *

CIBC has not pleaded particularized facts showing that Miller, McTaggart, or Peacock received a material personal benefit under the first *Zuckerberg* prong. It has likewise failed to adequately plead that the Demand Majority faces a substantial likelihood of liability on a non-exculpated claim under the second prong. Because these directors constitute a majority of the Board in place when this lawsuit was

---

*cf. Quadrant*, 102 A.3d at 186 (noting that courts do not second-guess tactical business judgments).

[183] Am. Compl. ¶¶ 126-27.

[184] *L.A. City Empls.' Ret. Sys. v. Sanford*, 352 A.3d 276, 300 (Del. Ch. 2026) ("Bad faith is 'not simply bad judgment or negligence,' but rather 'implies the conscious doing of a wrong because of dishonest purpose or moral obliquity . . . it contemplates a state of mind affirmatively operating with furtive design or ill will.'" (citation omitted)).

[185] *See Cornerstone*, 115 A.3d at 1179.

filed, CIBC has not demonstrated that demand would have been futile. CIBC's derivative claims in Counts I through IV are dismissed under Rule 23.1.

## C. Failure to State a Claim

The defendants also argue that the Complaint should be dismissed under Court of Chancery Rule 12(b)(6) for failure to state a claim on which relief can be granted.[186] Because demand is not excused under Rule 23.1, I need not conduct a further analysis of the breach of fiduciary claims or the contingent aiding and abetting claims in Counts I through IV.[187] That leaves the direct claim in Count V for tortious interference with contract against Peak and Barker.[188]

"The standards governing a motion to dismiss for failure to state a claim are well settled . . . ."[189] The court must accept:

> all well-pleaded factual allegations in the Complaint as true, accept even vague allegations in the Complaint as "well-pleaded" if they provide the defendant notice of the claim, draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any

---

[186] Board Defs.' Opening Br. 29; Peak Defs.' Opening Br. 18, 27.

[187] *See, e.g.*, *Horman v. Abney*, 2017 WL 242571, at *5 (Del. Ch. Jan. 19, 2017) ("Because I have concluded that demand is not excused under Rule 23.1, I will not reach the Director Defendants' arguments under Rule 12(b)(6). The analysis begins and ends with demand futility.").

[188] Am. Compl. ¶¶ 217-26.

[189] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896 (Del. 2002).

reasonably conceivable set of circumstances susceptible of proof.[190]

"[A] claim may be dismissed if allegations in the complaint or in the exhibits incorporated into the complaint effectively negate the claim as a matter of law."[191] The court need not, however, accept "conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[192]

To state a claim for tortious interference with contract, CIBC must allege: "(1) a contract, (2) about which defendant knew, and (3) an intentional act that is a significant factor in causing the breach of such contract (4) without justification (5) which causes injury."[193]  CIBC alleges that "Barker and Peak improperly induced BERA to breach the Credit and Forbearance Agreements" as part of Barker's "campaign to maximize his individual returns for the sale of BERA by holding out for a messianic purchase offer."[194]  The defendants argue that CIBC has not pleaded facts sustaining this claim.  Regarding Peak, they assert that the Complaint does not identify any action by Peak that was a significant factor in the purported breaches.

---

[190] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

[191] *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001).

[192] *Price v. E.I. DuPont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011), *overruled in part on other grounds by Ramsey v. Georgia S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255 (Del. 2018).

[193] *Grunstein v. Silva*, 2009 WL 4698541, at *16 (Del. Ch. Dec. 8, 2009).

[194] Am. Compl. ¶ 222.

As for Barker, they argue that he cannot be held personally liable for inducing a breach when he acted within the scope of his authority as a BERA director and officer.[195]

Analyzing the claim with respect to Peak leads me to conclude that the Complaint lacks well-pleaded facts showing Peak engaged in an intentional act inducing a breach. My analysis differs as to Barker, where it is reasonably conceivable he exceeded his authority as a BERA fiduciary by acting for personal motivations. Count V is dismissed as to Peak; it survives as to Barker.

### 1. Peak

CIBC contends that Peak tortiously interfered with the Credit and Forbearance Agreements by attempting to "tank the Terminus deal" and encouraging the Board to hold out for a superior offer that never came.[196] It suggests that the purported breaches of contract began when BERA fell below the minimum EBITDA covenants, culminating in BERA's failure to meet its debt obligations.[197] Yet CIBC does not allege a single action taken by Peak that caused BERA to violate the debt covenants and default on its loans.[198] Its claim therefore fails on the third element

---

[195] Board Defs.' Opening Br. 33-34; Peak Defs.' Opening Br. 28.

[196] Am. Compl. ¶¶ 20, 155.

[197] *Id.* ¶¶ 74, 85.

[198] *Id.* ¶¶ 221-24; Pl.'s Opp'n Br. 55-56.

of tortious interference—an intentional act that is a significant factor in inducing the breach.[199]

Peak had no obligation to continue infusing capital into BERA to bring it into compliance with its debt covenants, restore it to profitability, or pay its debts to CIBC.[200] Peak had already invested substantial capital in BERA.[201] Its refusal to volunteer additional capital or waive its liquidation preference cannot constitute wrongful interference.

Further, the allegation that Peak coordinated with Barker to pursue a higher offer is conclusory. CIBC does not explain why Peak—a minority stockholder without Board control—was responsible for ensuring that BERA complied with the Credit and Forbearance Agreements.[202] The claim therefore fails against Peak.

### 2. Barker

CIBC also claims that Barker tortiously interfered with the Credit and Forbearance Agreements by disrupting the sale process and threatening to convert BERA's assets to extract a personal payout.[203] The defendants argue that the claim

---

[199] *See supra* note 193 and accompanying text.

[200] Am. Compl. ¶ 72.

[201] *Id.* ¶¶ 58, 60.

[202] *See, e.g.*, *id.* ¶ 155 (alleging on "information and belief" that Peak encouraged Barker and Peak Directors Sheward and Reger to "hold out for a better purchase offer for BERA in an effort to line their own pockets").

[203] *Id.* ¶¶ 15, 129, 222.

fails because Barker is protected by the "stranger doctrine," his actions were not a significant factor in BERA's default, and his conduct was otherwise justified.[204] I disagree. CIBC adequately pleads that Barker's actions were a significant factor in inducing the breach of those agreements and lacked justification.

a.    Significant Factor in Causing the Breach

CIBC asserts that Barker acted "for his own personal profit" by holding out for a "messianic purchase offer," leaving BERA unable to repay its obligations to CIBC.[205] In support, it points to Barker's threat to loot corporate assets and transfer BERA's customer contacts, intellectual property, and employees to his own entity to induce such an offer.[206]

The defendants argue that Barker is protected under the "stranger doctrine," under which "employees . . . of a contracting corporation cannot be held personally liable for inducing a breach of contract by their corporations when they act within their role."[207] In other words, an agent cannot interfere with her principal's contract unless the agent acts outside the scope of her corporate role. Here, CIBC alleges that Barker sought to advance his own financial interest, which falls beyond his

---

[204] *See* Board Defs.' Opening Br. 33-36.

[205] Am. Compl. ¶ 222.

[206] *Id.* ¶¶ 15, 18, 132, 159.

[207] *OptimisCorp v. Waite*, 2015 WL 5147038, at *76 & n.602 (Del. Ch. Aug. 26, 2015) (citation omitted), *aff'd*, 137 A.3d 970 (Del. 2016).

corporate authority.[208] His alleged disruption of worthwhile offers for selfish reasons does not invoke the stranger doctrine.

The defendants further maintain that Barker's conduct cannot be a significant factor in the breach because BERA's defaults under the Credit Agreement began several years earlier.[209] This argument misses the mark. Whether Barker's alleged interference constituted a significant factor depends on its materiality, not whether it induced the first instance of breach. BERA's breaches of the Credit and Forbearance Agreements were ongoing and subject to cure.[210] By allegedly thwarting the Terminus, Hale, and ESW deals through backchanneled threats, Barker prevented BERA from having a chance to cure or satisfy the debt.[211] It is reasonable to infer that such conduct would have been a significant factor in BERA's defaults.

### b. Absence of Justification

CIBC must also demonstrate that Barker acted without justification.[212]

---

[208] *In re CVR Ref., LP Unitholder Litig.*, 2020 WL 506680, at *18 (Del. Ch. Jan. 31, 2020) (noting that an exception to the stranger doctrine occurs "when the corporate agent responsible for the wrongdoing was acting solely to advance his own personal financial interest, rather than that of the corporation itself" (citation omitted)).

[209] Board Defs.' Reply Br. 15; *see also* Am. Compl. ¶ 51 (noting that certain events of default under the Credit Agreement were acknowledged as early as August 6, 2020).

[210] *See supra* note 35 and accompanying text.

[211] *See supra* Sections I.E-G.

[212] *See supra* note 193 and accompanying text.

Delaware courts consider the factors listed in Section 767 of the Restatement (Second) of Torts when evaluating this element of a tortious interference claim.[213] These factors include:

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties.[214]

Because the Restatement factors entail a "fact-intensive" balancing test, they do not always lend themselves to resolution on the pleadings.[215]

Based on the Complaint, it is reasonably conceivable that Barker's conduct lacked justification. CIBC alleges that Barker resorted to threats hidden from his fellow directors to pursue a deal favorable to Barker alone.[216] These alleged actions, which occurred during a live sale process, used improper means to advance Barker's personal interests at the expense of BERA's other residual claimants.

---

[213] *See WaveDivision Hldgs., LLC v. Highland Cap. Mgmt., L.P.*, 49 A.3d 1168, 1174 (Del. 2012); Restatement (Second) of Torts § 767 (Am. L. Inst. 1979).

[214] *WaveDivision Hldgs., LLC*, 49 A.3d at 1174.

[215] *LiveBarn Inc. v. Black Bear Sports Gp., Inc.*, 2025 WL 1906638, at *4 (Del. Super. July 10, 2025).

[216] *See supra* Section I.G.

The defendants argue that CIBC must plead Barker's "sole motive was to interfere with the contract."[217] They posit that, even if Barker had foiled value-maximizing deals, the claim fails because CIBC has not alleged his only goal was to interfere with the Credit and Forbearance Agreements.[218] Instead, they assert, Barker could have sought to maximize the value of BERA's assets to benefit all stakeholders.[219]

That argument misapplies governing precedent. As the Delaware Supreme Court clarified in *Cousins v. Goodier*, a tortious interference claim will not be precluded "when the alleged tortfeasor can identify one proper motive among many unseemly ones."[220] It is reasonably conceivable that Barker's predominant motive was to enrich himself at the expense of BERA (and CIBC), making his interference unjustified.

Accordingly, CIBC has stated a viable claim against Barker for tortious interference with contract.

## III. CONCLUSION

The motions to dismiss are granted in part and denied in part.

---

[217] Board Defs.' Opening Br. 36 (quoting *WaveDivision*, 49 A.3d at 1174).

[218] *Id.*

[219] *Id.*

[220] 283 A.3d 1140, 1166-67 (Del. 2022).

Counts I through IV of the Complaint assert derivative claims.  Because CIBC neither made a pre-suit demand on the Board nor adequately pleaded that demand is excused as futile, those claims are dismissed under Rule 23.1.

The motion to dismiss Count V under Rule 12(b)(6) is granted as to Peak but denied as to Barker.

The parties must meet and confer on a schedule to govern the sole surviving claim and file a proposed scheduling order within 30 days.